IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 12, 2015 Session

**STATE OF TENNESSEE v. DENNIS LEE ARNOLD**

**Appeal from the Criminal Court for Davidson County**
**No. 2011-D-3695     J. Randall Wyatt, Jr., Judge**

_____

**No. M2014-01133-CCA-R3-CD – Filed September 1, 2015**

_____

The Defendant, Dennis Lee Arnold, was convicted by a Davidson County Criminal Court jury of two counts of aggravated sexual battery, Class B felonies, and solicitation of a minor, a Class C felony. *See* T.C.A. §§ 39-13-504, 39-13-522, 39-12-102 (2014). The trial court sentenced the Defendant to consecutive terms of eleven years for the aggravated sexual battery convictions at 100% service and five years for the solicitation conviction, for an effective twenty-seven-year sentence. On appeal, the Defendant contends that the trial court erroneously admitted prior bad act evidence pursuant to Tennessee Rule of Evidence 404(b). We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., J., joined. JAMES CURWOOD WITT, JR., J., filed a separate concurring opinion.

James O. Martin III (on appeal), Nashville, Tennessee, and Tillman Payne and Donna Wagner (at trial), Mount Juliet, Tennessee, for the appellant, Dennis Lee Arnold.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Victor S. (Torry) Johnson III, District Attorney General; and Kristen Menke and Brian Ewald, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Davidson County Grand Jury returned a fifteen-count indictment that charged the Defendant with multiple counts of aggravated sexual battery, attempted rape of a child, and

solicitation of a minor. Before the trial, nine counts were dismissed, and the trial proceeded on three counts of aggravated sexual battery and three counts of solicitation of a minor. At the conclusion of the proof, the trial court dismissed three additional counts. The jury convicted the Defendant of the remaining three counts.

## Pretrial Motion

Before the trial, the State filed a notice of intent to present evidence of the Defendant's prior bad acts pursuant to Tennessee Evidence Rule 404(b). The evidence centered on the Defendant's threatening violence and engaging in violent acts against the victim, who was also the Defendant's adopted daughter, and her family "during the course of the time period of the indictment and following the victim's disclosure." The State sought permission to present the relevant evidence through witness testimony from the victim, her mother, her maternal grandparents, the Defendant's sister, the Defendant's mother, Metropolitan Nashville police officers, and Wilson County firemen regarding incidents occurring in 2011. The State argued the evidence was to show the victim's fear of the Defendant and how her fear permitted the Defendant to abuse the victim sexually, to explain the victim's reluctance and delay in disclosing the abuse, and to show the Defendant's repeated attempts to control the victim and her family through fear after the victim's disclosure.

At the pretrial motion hearing, Metro Police Officer James Boone testified that on July 11, 2011, he responded to a vandalism call in which a vehicle had been driven into a house owned by the victim's maternal grandparents. The victim's grandfather told Officer Boone what occurred, and Officer Boone saw that a gray or silver minivan had been driven into the side of the house near the garage area. Photographs showed that the front of the minivan had gone through the brick exterior of the home. Photographs also showed damage to the water meter of a neighboring house. Officer Boone determined that the minivan was registered to the homeowners' daughter and the Defendant, who was the homeowner's son-in-law. The homeowners wanted to prosecute the Defendant and decided to follow Officer Boone to the police station to begin the prosecution process.

Officer Boone testified that during the drive, the Defendant "crossed paths" with him and the homeowners. He said the Defendant was traveling toward the homeowners' residence. Officer Boone initiated a traffic stop of the Defendant's older model blue truck, and the homeowners continued traveling downtown to obtain a warrant for the Defendant's arrest. Without request, the Defendant exited his truck, placed his hands up, and told the officer that he was not going to fight, had lost his mind, and had been off his medication. Officer Boone said the Defendant mentioned "ramming" his vehicle into the side of the house. When Officer Boone arrived at the police station, the homeowners had completed the

process for obtaining a warrant against the Defendant for felony vandalism. He said additional warrants were obtained for other incidents unrelated to the Defendant's crashing the minivan into the house.

On cross-examination, Officer Boone testified that he permitted the Defendant to take medication that was contained in the Defendant's backpack. The Defendant was not agitated, but he complained that he felt as though he was going to "pass out" and requested permission to take his medication. On redirect examination, Officer Boone stated that he saw no indications the Defendant was intoxicated.

The victim's maternal grandmother testified that the Defendant was her former son-in-law. She said that her daughter, the victim's mother, filed for divorce and obtained a restraining order against the Defendant in 2011. She learned her daughter and the Defendant were scheduled to appear in court on July 14 about child visitation. She said the Defendant had been questioned by the police about molesting the victim. She said that in April, two of the victim's friends came to her house to talk about the Defendant's molesting the victim. She said that about two or three weeks later, the allegations were reported to authorities in Wilson County, where the victim's mother and the Defendant lived at the time of the disclosure. She said that her daughter learned of the sexual abuse allegations in late May and that the Defendant was questioned by the police about the allegations on July 11.

The victim's grandmother testified that she had no contact with the Defendant between May 31 and July 9. The victim's mother and her children began living with the victim's grandmother on May 31. The victim's grandmother said that on July 10, the Defendant began calling her. Although she did not answer the telephone, the Defendant left multiple voicemail messages between Sunday night and Monday morning. She said the Defendant began calling around 8:00 p.m. and continued calling until the early morning hours of July 11. She said her husband did not arrive home from work until 11:30 p.m. She said that the Defendant threatened to come to her house, take the children, and "chop off" the head of the victim's sister's dog. She became nervous after listening to the voicemail messages and said the messages became more threatening throughout the night. She called 9-1-1 at 1:00 a.m. because she was scared, and the police came to her house, listened to the messages, and completed a report.

The victim's grandmother testified that about ten minutes after the police left her house, the Defendant arrived in his blue truck. She called 9-1-1 and saw the Defendant walk to the back of her house, enter her daughter's minivan, and drive it away. The police returned and completed another report. Later that morning, she drove her daughter to work. Five or ten minutes after she returned home around 8:00 a.m., she heard the Defendant attempting to enter her garage by yanking on the garage door handle. The Defendant began

beating on the front door. She grabbed the children, woke her husband, ran to the bathroom, and called 9-1-1. The Defendant beat on the door for a few minutes and left. When the police arrived, she saw that the Defendant had picked up a fifty- to seventy-pound landscape rock and placed it on top of her van. She said the side window on her van was broken. She did not hear the Defendant say anything while he was there. The police completed a third report. She said the damage to her van totaled $2000.

The victim's grandmother testified that she agreed to go with the police to obtain an order of protection and that as she got in the police car, the Defendant called. She did not answer the phone, but the Defendant left a voicemail message threatening to hurt her daughter and stating that her daughter's injuries would be the victim's grandmother's fault because the victim's grandmother would not allow him to see his children. The police officer listened to the message, and the victim's grandmother successfully obtained an order of protection. She said that while she obtained the order of protection, her husband remained at the home and attempted to take a nap after the police left but that the Defendant returned.

The victim's grandmother testified that after she listened to the Defendant's message during which he threatened her daughter, she called the Defendant's sister, Christie Barcus. The victim's grandmother said that Ms. Barcus's mother and stepfather, Judy and Steve Lancaster, drove to the hospital where the victim's mother worked. Ms. Barcus picked up the children at some point that afternoon.

On cross-examination, the victim's grandmother testified that she thought her daughter filed for divorce on June 1 or 2 and that at that time, the Defendant had checked himself into an inpatient rehabilitation program for alcoholism. She thought the Defendant remained at the hospital for one or two weeks. She said that although her daughter had already filed for divorce before the Defendant left the program, no court proceedings had occurred. She said the first court date was scheduled for July 14 and noted the order of protection prohibited the Defendant from seeing her daughter and the children until July 14.

The victim's grandmother testified that she delayed reporting the sexual abuse allegations because she attempted to have the victim's friends talk to the victim's mother. She said that she eventually contacted Ms. Barcus, who "guessed" correctly that the Defendant was "walking around with no pants." Ms. Barcus picked up the victim and the victim's friend and drove to the police station. The victim's grandmother said that to her knowledge, no one contacted the Defendant about the children. She agreed the children stayed with her when her daughter and the Defendant worked.

The victim's grandmother testified that the Defendant looked angry when he returned to the house and that he attempted to open the garage door and banged on the front door. She and the children were scared.

The victim's maternal grandfather testified that he lived in Davidson County and that on July 10, he worked from 2:30 p.m. to 11:00 p.m. When he arrived home, he listened to the voicemail messages left by the Defendant. He said that the Defendant threatened to kill his wife in two of the messages and to kill his granddaughter's dog. He said they called 9-1-1, and the responding officers completed a report. He said that around 2:00 a.m., the Defendant parked his truck in front of their house, entered his daughter's minivan, and drove away in the van.

The victim's grandfather testified that around 8:00 a.m., the Defendant returned and beat on the front door. He said the Defendant yelled, although he did not understand what was said. The victim's grandfather felt threatened by the Defendant's conduct and said a motion sensor was knocked off the front door by the Defendant's beating. He said the Defendant also bent the garage door by pulling on it. He said the Defendant placed a landscape rock weighing about eighty to 100 pounds on the victim's grandmother's van and caused a window to shatter. The victim's grandfather said that during this incident, three of his grandchildren other than the victim were present. The police arrived not long after the Defendant left. The victim's grandfather said that the victim's grandmother left with the children and that he secured the house and the van in the event the Defendant returned.

The victim's grandfather testified that around 11:00 a.m., he heard a crash outside. He said the Defendant had driven the van he took earlier into the side of the house. The victim's grandfather saw that the side door at the garage had been knocked off its hinges. He called 9-1-1, but the Defendant had left in his truck by the time the police arrived. The victim's grandfather identified photographs of the scene and said the cost to repair the damage was about $10,000. The victim's mother and Mr. and Ms. Lancaster arrived at the victim's grandfather's house while the police were investigating, and everyone went to the police station to obtain an order of protection and a warrant for the Defendant's arrest related to the vandalism. The victim's grandfather said that when Officer Boone arrived at the police station, the Defendant was in police custody.

The victim's grandfather testified that before July 2011, he would not have considered the Defendant a violent person. He did not speak to the Defendant between May 31 and July 10, although he knew of the pending divorce proceedings and the sexual abuse allegations.

On cross-examination, the victim's grandfather testified that voicemail messages deleted automatically from his wife's cell phone after fourteen days. He did not know if child visitation arrangements had been made, but he knew a court date was scheduled two or three days after the incidents. He did not know if anyone contacted the Defendant after the victim's mother filed for divorce on May 31. He agreed his daughter and the Defendant jointly owned the minivan. The victim's grandfather said that he did not attempt to talk to the Defendant or to calm the Defendant when he knocked on the front door.

The victim's grandfather testified that his daughter instructed him not to have contact with the Defendant until they had made arrangements regarding the divorce and child visitation. He said that he had not seen the Defendant intoxicated in all the years his daughter and the Defendant were married.

Christie Barcus, the Defendant's sister, testified that she became involved in the present case after talking to the victim's maternal grandmother on May 23. They discussed the Defendant's not permitting the victim's brother to go on a trip with another family member. Ms. Barcus became concerned when the victim's grandmother began talking about things "outsiders" were saying about the Defendant. Ms. Barcus assumed the outsider was the victim's friend, and after pressing, the victim's grandmother reported that the victim's friend had said the Defendant had done inappropriate things in the presence of the victim and her friend. Ms. Barcus sent the victim a text message requesting to speak in person, and Ms. Barcus met the victim at the friend's apartment.

Ms. Barcus testified that she knew the allegations were true because Ms. Barcus was involved in a similar incident with the Defendant when Ms. Barcus was young. She and the victim did not discuss the details of the allegations, but Ms. Barcus expressed her belief that the Defendant had acted inappropriately. Ms. Barcus, the victim, Ms. Barcus's mother, and the victim's friend went to the Wilson County Sheriff's Department. An initial report was completed, and the women were told a detective would contact them. Ms. Barcus, the victim, and the victim's friend returned to the sheriff's department on May 27. Ms. Barcus denied having contact with the Defendant between May 23 and May 27. The investigating detective told them not to inform the Defendant that they had reported the allegations and to act normal around the Defendant. Ms. Barcus recalled that it was Memorial Day weekend and that her mother pretended she was ill in order to cancel a family gathering.

Ms. Barcus testified that she spoke to the Defendant after the victim's mother was notified of the allegations and that the Defendant was interviewed by the investigating detective in Wilson County. She said the Defendant told her that he was thinking about driving his truck into a wall and that the girls "run around in bikinis and half-naked. I'm just a man." Ms. Barcus replied, "That's just sick. What about me?" The Defendant stated,

-6-

"That was just adolescence." She requested the Defendant seek medical treatment, and the Defendant complied. She said that on July 24, and after one week of treatment, the Defendant sent her a text message stating, "You're a lying b----." She said the Defendant accused her of ruining his life and hoped he outlived her in order for him to urinate on her grave. Relative to the incident involving the Defendant and Ms. Barcus years earlier, the Defendant told her that she was not raped and that she "wanted it." The Defendant stated that she was "a s--- like [her] mother." She said she received similar text messages for several days. Relative to the allegations involving the victim, the Defendant stated that the victim had "sex for money in his house" and that he had a video recording to prove it. Ms. Barcus said the Defendant also accused the victim's friend of performing oral sex on him in exchange for $20.

Ms. Barcus testified that although the Defendant did not threaten to harm her, she and her husband were scared of the Defendant. She recalled one night when she received a text message from the Defendant in which he claimed to be in her yard. She and her husband were home. They turned on the front porch light, and Ms. Barcus received another message stating "in the backyard stupid." She and her husband went to the backyard, and she received another message in which the Defendant laughed. She called 9-1-1. The police could not locate the Defendant, and the text messages stopped for about forty to forty-five minutes. After the police left, she received additional text messages. She felt as though the Defendant was watching her. She said she received the messages between June 24 and July 1, and she obtained an order of protection during that time.

Ms. Barcus testified that she believed the Defendant's threatening the victim's mother was legitimate based on her experience with the Defendant. She said that she had witnessed his rage and that she "had to handle him in a manner . . . to keep him from going into a rage." She said that after the Defendant ran his minivan into the side of the victim's grandparents' house, she looked inside the van and saw the orders of protection she and her mother obtained against the Defendant and two new packages that had contained fillet knives.

On cross-examination, Ms. Barcus testified that she lived in Rutherford County and that she lived with the Defendant until she was nineteen years old when he entered the Army. The Defendant lived with her, her daughter, and her mother and stepfather a short time after the Defendant left the Army. She also stayed with the Defendant for one week when she was in the process of moving.

Ms. Barcus testified that she did not know the details of the sexual abuse allegations against the Defendant and denied talking to anyone about the details. She clarified, though, that she knew the details of what the victim's grandmother told her in late May and said those details were similar to an experience she and two of her friends had with the Defendant. She

said that on the day she talked to the victim and the victim's friend at the victim's friend's apartment, the Defendant had asked the victim to leave the family home. She did not tell the victim's mother or the Defendant about the allegations before speaking to the police. She said the plan to remove the victim's mother from the family home while the police interviewed the Defendant was only a precaution because of previous violence. She did not know how the Defendant learned that she helped report the allegations to the police.

Ms. Barcus testified that although she did not have the text messages from the Defendant with her in court, she had them at home. She said she had about twenty messages from the Defendant. Relative to the Defendant's health, she knew he had previous neck surgeries, had high blood pressure, and was overweight. She said the Defendant reported having a chemical imbalance. She agreed the Defendant stopped sending text messages after July 1 and said she knew the Defendant had been served with the order of protection.

Ms. Barcus testified that when the Defendant lived with her after his release from the Army, he was helpful around the house and helped with her infant daughter. She said, though, the Defendant never took care of her daughter without other adults present.

On redirect examination, Ms. Barcus testified that the Defendant accused her of "putting [the victim up] to these allegations." She recalled one text message in which the Defendant stated, "If you were smart you had better not let me find out that you are trying to manipulate [the victim]." She said that although the Defendant did not threaten to kill her, his messages were meant to intimidate and scare. She recalled the Defendant's attempting to kill her and her other brother with an ax when she was a teenager.

Johanna Barendse testified that she worked with the Defendant and the victim's mother at a hospital. She had worked with the victim's mother for about eight years. She said that on July 11, the victim's mother worked in one of the operating rooms as a scrub technician. She said that not long after the victim's mother arrived for work, she requested permission to go home. Although Ms. Barendse denied her request initially, she told the victim's mother that she could go home as soon as another technician arrived. The victim's mother was crying and upset, and she told Ms. Barendse that she was scared and wanted to go home.

Ms. Barendse testified that on July 11, the Defendant was on vacation but that he came to the front desk of the operating room. She said he wore a t-shirt with holes and shorts and asked for the victim's mother. Ms. Barendse said the Defendant had a "wild expression" in his eyes and clutched his fist on the side of his body. She said that his face and neck were red and that he asked for a suit that was worn in sterile areas of the hospital. She said the Defendant entered the sterile hallway and looked through the window in each of the sixteen

operating rooms for the victim's mother. Ms. Barendse said that the victim's mother had left work by that time and that she texted the victim's mother to inform her that the Defendant was looking for her. She said that security was called to the operating room but that she did not know what transpired afterward.

On cross-examination, Ms. Barendse testified that the operating room director left a note at the front desk requesting that security be notified if the Defendant came to the floor. She said that the victim's mother stated she was scared of the Defendant and thought he might "do something." Ms. Barendse did not notify security but said the secretary at the front desk knew of the note and talked to the Defendant.

Julia Lancaster, the Defendant's mother, testified that the victim was age eight when the victim's mother and the Defendant began dating and that after the victim's mother and the Defendant married, the Defendant adopted the victim and the victim's brother. After the victim's mother and the Defendant married, they had three additional children. She said that everyone appeared well-adjusted, except for the victim's brother, whom the Defendant treated differently than the other children. She said that the victim's brother was not permitted to eat with the family or to have a telephone, toys, or clothes. Although she did not know how the victim's mother reacted to the Defendant's treatment of the victim's brother, she knew nobody rebelled against the Defendant's rules. She feared the Defendant's violent rages and did not "want that to fall down" on the victim's mother and the children. Ms. Lancaster witnessed the Defendant's controlling behavior relative to his family but said the violent rages she witnessed occurred when the Defendant was young.

Ms. Lancaster testified that the Defendant controlled his family and that she did not observe much affection between them. She said the victim's mother, the victim, and the victim's brother always had to ask the Defendant's permission to do anything, although the other children did not. She said that at the time of the victim's disclosure, the Defendant was six foot and weighed about 200 pounds. She learned of the allegations from Ms. Barcus and said she and Ms. Barcus talked to the victim and the victim's friend about the allegations. After the discussion, they drove to the Wilson County Sheriff's Department.

Ms. Lancaster testified that after the victim's disclosure to the police, Ms. Lancaster had no contact with the Defendant until June 24. She said the Defendant entered an inpatient treatment program for several days. She said that just before his planned release, the Defendant went "googoo" and remained in the program for a few additional days. She said the Defendant called her from his home telephone on June 24. She said that the Defendant accused the victim of lying and that he became angry when Ms. Lancaster said the allegations were similar to the allegations Ms. Barcus made against the Defendant. Ms. Lancaster said the Defendant cursed her and said that he hated her and that he wanted her to know he hated

her before she was diagnosed with Alzheimer's disease. She noted her family history of the disease and said the Defendant told her that he wanted her to suffer a slow death. She obtained an order of protection against the Defendant after the telephone conversation.

Ms. Lancaster testified that the Defendant began sending text messages after June 24, which stated, "Don't forget how you used to hold me under water until I passed out," and, "Don't forget the hat pins you used to stick in me." She denied abusing the Defendant. She said that on July 4, around 10:00 p.m., the Defendant called her home. She and the Defendant talked for a few minutes, and she recalled having a normal conversation. She said that the Defendant suddenly said, "And in fact, you know, if you [were] standing in front of me right now, I would slit your f'ing throat from ear to ear. I'd blow your f'ing head off." She obtained a warrant for the Defendant's arrest after the telephone conversation because the Defendant had violated the order of protection.

Ms. Lancaster testified that between June 24 and July 4, the Defendant threatened to follow her for the remainder of her life, and she assumed he did, although she did not see him following her. She said that on July 4, the police were called to her house several times. An officer read the order of protection to the Defendant over the telephone. Ms. Lancaster recalled the Defendant's referring to "Officer Bozo" because he did not think he was speaking to a legitimate police officer. She said the officer provided the Defendant with a badge number and told the Defendant the conversation was being recorded. She said the Defendant was intoxicated. Ms. Lancaster had no contact with the Defendant between July 4 and July 11. She said that she believed the Defendant would kill everyone if he were given the opportunity.

On cross-examination, Ms. Lancaster testified that the victim's brother was a good child, although he performed poorly in school. She said she was in the family home on special occasions and holidays and noted the victim's brother was usually not permitted to participate. She said the victim's brother was a wonderful young man in spite of the Defendant's hating him. She asked the Defendant about his treatment of the victim's brother and expressed her concern that he was too harsh, and the Defendant said the victim's brother was doing poorly in school and was not listening to him. She said that the younger children sneaked food to the victim's brother.

Ms. Lancaster testified that after the Defendant's release from the Army, she only saw the Defendant in a rage when he wanted to kill the victim's mother's former husband. She said that during a rage, the Defendant's eyes bugged out, his top lip disappeared, his voice developed a harsh tone and rose several octaves, he clinched his fists, and his face turned red. She recalled the Defendant pushed her across the room and into a chair when the Defendant was age eighteen.

Ms. Lancaster testified that the Defendant's June 24 communication with her was in response to her telling the Defendant's father to cease communicating with the victim's mother on behalf of the Defendant. She said the Defendant lived at the family home after his release from treatment, and the victim's mother and the children lived with the victim's maternal grandparents. She agreed the Defendant might have felt isolated from his family. She agreed the Defendant's June 24 telephone call was the same day she told the Defendant's father not to help the Defendant contact the victim's mother. She said that the Defendant's attempting to contact his family violated the order of protection. On redirect examination, she stated that she assumed her contacting the Defendant's father led to the Defendant's rage and the June 24 telephone call.

The victim's mother testified that she and the Defendant met at the hospital in 1999, married in 2001, and moved to Wilson County in 2007. She said that their relationship was good in the beginning but that as the Defendant began drinking alcohol, conflict in the household increased. She said that at some point, the Defendant told her that he would make all the parental decisions concerning the victim and the victim's brother. She said that if she disagreed with any of the Defendant's decisions, he became angry, yelled, threw things, punched holes in the walls, and broke things. She attempted to maintain peace. Relative to the victim's brother, she said that the Defendant did not like the victim's brother and that the victim's brother never did anything right. She said that when the victim's brother did anything wrong, the Defendant imposed severe punishments, including depriving him of electronics, turning off the electricity to his bedroom in the middle of summer, and sending him to bed without dinner. She said the Defendant determined whether the victim's brother ate. She and the Defendant fought constantly about the Defendant's treatment of the victim's brother.

The victim's mother testified that the Defendant also controlled the victim and that if she permitted the victim to do something without obtaining the Defendant's consent, the Defendant yelled, threw things, and punched holes in the walls. She said that the Defendant's "blow-ups" scared her and that she feared for her and her children's safety at times. She said that although the Defendant permitted the victim to stay overnight at her friends' homes on occasion, the victim's friends mostly stayed at the victim's house per the Defendant's rule. She said that several times the Defendant did not allow the victim to attend school, although the victim's mother did not know why. She said that the Defendant did not go many places with her and the children. She said that when the Defendant attended family holiday functions, he did not drink alcohol.

The victim's mother testified that on May 31, she first learned of the sexual abuse allegations from Ms. Barcus. She said she packed a few belongings for her and the children and left the family home with Ms. Barcus. At the time of the trial, her children lived with the

victim's maternal grandmother. The victim's mother said that her only contact with the Defendant since she learned of the allegations was when the Defendant called her from the treatment center requesting she pick him up. She said that on June 3, she met with an attorney and filed for divorce. The attorney obtained an order of protection as part of the divorce proceedings, and the Defendant did not attempt to contact the victim's mother afterward. She said the Defendant was served simultaneously with the order of protection and the divorce papers. She said, though, that the Defendant dropped off a cage of rabbits at her parents' house in the middle of the night while everyone slept. She felt threatened because it showed that the order of protection could not prevent the Defendant from doing anything.

The victim's mother testified that she and the children were sleeping when the Defendant called her mother's house multiple times on June 10 and 11. She said that after she obtained an order of protection, she saw the Defendant twice at work. She said that the first occasion was uneventful but that on the second occasion, the Defendant commented about her keeping the children from him and denied touching the victim. The victim's mother said that her mother called 9-1-1 and woke her when the Defendant came to the house on June 10. Later that night, the Defendant returned and took her minivan, and the police returned. The next morning, her mother drove her to work. She did not see the Defendant on July 11. While at work, she received text messages from Ms. Barcus stating that it was unsafe and that she needed to leave work. Ms. Barendse permitted the victim's mother to leave work as soon as possible. Although the victim's mother did not think the Defendant would behave badly in the presence of his coworkers at the hospital, she left work. She said Ms. Barendse sent her a text message stating that the Defendant was at the hospital looking for her. The victim's mother realized she needed to take the Defendant's threats seriously.

The victim's mother testified that she learned from her father that the Defendant drove her minivan into her parents' house. She said that when her mother drove her to work, the Defendant's truck was parked along the street and that after the van was driven into the house, the Defendant's truck was gone. She said the Defendant left his wallet and keys in the van and noted the packaging for two knives was inside the van. She followed the police officer's instructions and drove to the police station to obtain an order of protection. She learned that while she was at the police station, the Defendant had been arrested.

The victim's mother testified that after the Defendant's arrest, she drove to the family home to check on the family's two dogs. She said the Defendant left a voicemail message on her mother's phone the previous night stating that he would kill the dogs if her mother did not return his call. When she arrived at the home, she saw the dogs outside and noticed the windows were black. She called the fire department, and the responding firemen determined that the home had been set on fire. She said that because of the smoke damage, the interior

of the home was completely renovated. The Wilson County Fire Department investigator and the insurance company investigator each determined that gasoline was used to start the fire and that arson was the cause of the fire. She said the Defendant was the suspect for the arson and noted only she and the Defendant had a key to the house. The victim's mother concluded that the Defendant's conduct was the result of his losing control of his family after he had controlled everyone for many years. She noted the Defendant previously stated during their marriage that he had killed people while he was in the Army and that the police "won't get me down."

On cross-examination, the victim's mother testified that the Defendant's drinking increased over time and denied that the increased consumption coincided with a surgery for a work-related injury. She said that although the victim's brother was a source of tension in the household, the victim's brother's only behavioral problem was his refusal to complete his schoolwork. She admitted the victim's brother was disciplined at school a couple of times, including for taking another student's iPod, but she denied any major problems. She did not recall the victim's brother's throwing food and other items at her.

The victim's mother testified that the victim, the victim's brother, and the Defendant were happy about the adoption. She said the adoption gave the Defendant complete control over the children. She said that although she and the Defendant discussed what decisions to make relative to the children, the Defendant ultimately made the decisions. She said the Defendant prevented the victim from attending elementary school on occasion, although she did not recall the Defendant's reasons.

The victim's mother testified that she spoke to the Defendant once while he received treatment but denied she told the Defendant that she "would have kept him, but Davidson County [was] involved." She agreed the Defendant did not threaten her when she saw him at work after the order of protection was obtained. Relative to Ms. Barcus, the victim's mother admitted Ms. Barcus helped her find a divorce attorney, attended the first meeting with the attorney, and attended a couple of court proceedings relative to the divorce. She denied Ms. Barcus paid for the attorney or supported her financially. She said Ms. Barcus once provided financial assistance to help purchase Christmas presents for the children.

The victim's mother testified that the Defendant never took the children on outings or attended field trips but that the Defendant took the victim to the store. She denied she gave the Defendant control over the victim and the victim's brother because they were difficult children.

On redirect examination, the victim's mother testified that Ms. Barcus provided financial assistance at Christmas because she and her children lost everything during the house fire and because the insurance company had not yet excluded her as the perpetrator of the arson. She said Ms. Barcus organized clothing and toy donations for her and the children because they lost everything in the fire.

The victim testified that she was age twenty and born on August 18, 1992. She was age eight or nine when the Defendant married her mother and was age eleven or twelve when he adopted her. She denied reporting the Defendant's abuse to anyone and said two of her friends spoke to her maternal grandmother, who spoke to Ms. Barcus. Ms. Barcus approached the victim about the abuse.

The victim testified that the victim's friend was at her home frequently when she lived in the Davidson County family home and around the time of the alleged abuse. She described the sexual contact as "a lot of touching." She said the Defendant told her that he would "come after" her if she told anyone about the abuse, that he was above the law, and that the police could not do anything about it. She said that she was age twelve at the time of the abuse and recalled being in the sixth grade. She believed the Defendant's threats and did not disclose the abuse to anyone, although she and the victim's friend "talked about some things[.]" She did not tell her mother about the abuse because she was scared for her mother. The victim said that the Defendant was mean and controlling and that she was not permitted to ask her mother's permission to do anything. She said that when the Defendant was angry, he punched holes in the walls, and she noted that the Defendant punched holes in her bedroom walls. She recalled the Defendant's throwing both her computer and a large container of tea across the room. She and her brother were ordered to clean up the tea afterward. She recalled the Defendant's throwing a can of food across the room, which nearly struck her mother in the head. She said the Defendant also threatened her and her brother's lives.

The victim testified that the Defendant treated her brother differently from her other siblings. The victim's brother could not talk on the telephone or have an iPod, and he had to sit on the sofa at family gatherings. She said her brother was not permitted to play with her or their cousins. She said the Defendant did not permit her brother to eat meals or bathe on occasion. She feared that if she disclosed the sexual abuse, the Defendant would treat her as he treated her brother. She said the Defendant was "weird with boys." She said that the Defendant threatened a boy who had been swimming with her and her siblings.

On cross-examination, the victim testified that she was not aware of any tension between the Defendant and her biological father, although she did not see her biological father between fifth grade and her eighteenth birthday. She agreed she was age eighteen

-14-

when she disclosed to the Wilson County authorities the abuse that occurred in Davidson County. The victim agreed that Ms. Barcus told her what the Defendant did to Ms. Barcus on the day the victim made her disclosure. Ms. Barcus drove the victim to the police department, but Ms. Barcus was not present when the victim spoke to the police. On May 23, the victim told the police everything the Defendant had done to her.

The victim testified that the Defendant assaulted her brother and recalled her brother's standing against a wall while the Defendant hit him repeatedly. The Defendant shoved the victim once and hit her a few times. She said that her injuries did not warrant medical treatment and that nobody reported any child abuse. She denied her brother intentionally broke things around the house and said the Defendant made her brother sit at the kitchen table or on the sofa and told him not to move. She said that the Defendant also locked her brother in his bedroom without food and disconnected the electricity to his bedroom. She recalled this was how her brother lived almost daily.

On redirect examination, the victim testified that on one occasion, she and the Defendant argued in the laundry room, although she did not recall the topic of the argument because they argued constantly. She recalled the Defendant's pulling out a knife during the argument.

## Trial

At the trial, Metro Police Officer James Boone provided testimony consistent with his pretrial hearing testimony regarding the July 11, 2011 events at the victim's maternal grandparents' house, his investigation regarding the vandalism, his apprehending the Defendant, and his assisting the homeowners in obtaining an order of protection against the Defendant. The photographs of the minivan he identified at the pretrial hearing were received as an exhibit. He responded to the house on July 11 around 11:15 a.m., and he recalled other officers responded to the house three times the previous night. On cross-examination, Officer Boone provided consistent testimony regarding his permitting the Defendant to take his medication and the Defendant's demeanor at the time of the arrest. Although the victim's grandfather reported the Defendant carried a knife, Officer Boone found no weapons in the Defendant's possession.

The victim's friend testified that she was born on June 12, 1992, and that she and the victim had been best friends since age eleven or twelve. She said that by seventh grade, she and the victim mostly spent time at the victim's apartment in Davidson County. She said the victim's home was chaotic with the victim's younger siblings. She began staying overnight and visited the home twice per week. The victim rarely came to the victim's friend's house. The victim's friend said that the victim's house was "creepy" at night and that she had an

"uncomfortable vibe" after the victim's mother went to sleep. She recalled the Defendant's watching pornography and masturbating at night in the living room after the victim's mother went to sleep. She said the Defendant asked them if they wanted to watch it with him. The victim's friend said she saw the Defendant masturbating. She suspected the Defendant might have been doing something inappropriate to the victim when nobody else was there, but she said the victim always denied any inappropriate contact.

The victim's friend testified that the Defendant commented to her and the victim about their appearances and about their other friends' appearances. She said the Defendant commented on their buttocks, looked at them creepy, and stared without speaking. She recalled instances when the Defendant entered the victim's bedroom late at night while they were "hanging out" and talking, sat in the victim's bedroom, listened to their conversations, and stared at them. She and the victim attempted to ignore the Defendant and to pretend he was not there.

The victim's friend testified that the Defendant provided her and the victim with alcoholic beverages, although she never asked for them. She said the Defendant was always drinking. The victim's friend recalled an incident in which she, the victim, and another friend were on the family computer in the living room. The girls had their backs to the television, and the victim's friend said that they heard the Defendant turn on pornography. The girls did not acknowledge the Defendant or the programming and did not discuss the incident afterward. The victim's friend was age thirteen at the time. She said the Defendant was scary because she did not know what he was capable of doing. She recalled incidents during which the Defendant "flipped out" about things and yelled at the family. She said the victim and her family "catered" to the Defendant to prevent any incidents.

The victim's friend testified that the Defendant threw the victim against a wall and choked her and that the victim ran from the family home. The victim's friend said that she witnessed the Defendant's violence toward the family but that the Defendant did not direct his yelling and violence toward her. She said that the victim's mother usually was quiet and kept to herself away from the Defendant and that the three youngest children stayed close by the victim's mother. She said that when she stayed at the victim's home, the Defendant ordered the victim's brother to his bedroom in the attic. She recalled that the attic door had no handle and that the Defendant turned off the electricity and water to the attic at times. She also recalled the Defendant's throwing away any new clothes the victim's mother bought the victim's brother. Although the Defendant never provided an explanation for his conduct, the victim's friend thought the Defendant wanted the girls to think the victim's brother was "the bad guy" and wanted to embarrass him to the extent the girls would not talk to him.

-16-

The victim's friend testified that on one occasion when she and the victim were in the eighth grade, they went swimming at the victim's apartment. The girls met a boy who attended the high school the girls would attend in the fall. The victim's friend recalled the Defendant's telling the boy that if the Defendant ever saw him around the victim, the Defendant would "slit his throat." She said the boy had done nothing to warrant the Defendant's threat.

The victim's friend testified that although the Defendant was creepy and weird, she continued to go to the victim's home to support the victim. The victim's friend did not want the victim to deal with it alone. She said the victim stayed at her house infrequently because the Defendant did not permit it, but the Defendant paid the victim's friend for gas. She denied that she performed sexual acts on the Defendant in exchange for money.

The victim's friend testified that she decided to express her concerns about the Defendant's conduct to the victim's maternal grandmother. She did not want the victim to know she was going to talk to the victim's grandmother because she feared the victim would have been angry. The victim's friend unsuccessfully attempted to talk to the victim's mother about her suspicions. She said, though, that the Defendant's sister, Ms. Barcus, talked to the victim before the victim's friend had the opportunity to talk to the victim's mother. She said that Ms. Barcus came to her apartment to talk to her and the victim and that immediately after the conversation, they drove to the Wilson County Sheriff's Office to report the alleged abuse. She later spoke to Detective Weaver.

The victim's friend testified that during the eighth grade, her mother drove her to the victim's home in the mornings and that she rode to school with the victim and the victim's maternal grandmother. She said that there were occasions when the Defendant did not permit the victim to go to school. She said the Defendant was in charge of the family. She said everyone always complied with the Defendant's requests.

On cross-examination, the victim's friend testified that she did not stay overnight at the victim's home through the week and that the events she saw occurred on the weekends and in the mornings before school. She said the Defendant and the victim's mother usually were not home when her mother dropped her off at the victim's house before school. She said that the Defendant cooked dinner for the family. She said that she and the victim usually went to sleep around midnight or a little later and that by this time, everyone else in the house was asleep except the Defendant. She said that on Saturdays, the family stayed at home during the day and that everyone but the Defendant went to the victim's maternal grandparents' house in the evening.

The victim's friend testified that the first incident in which the Defendant was watching pornography and masturbating in the living room occurred during the school year but that she did not know the time of the year or the day of the week. She did not "look directly at it" to know if the Defendant had an erection. She said the Defendant was wearing shorts and a tank top. She and the victim were downstairs long enough to get a drink and return to the victim's bedroom. The victim's friend did not tell her parents about the Defendant's conduct. She did not witness any sexual contact between the victim and the Defendant.

The victim's friend testified that after the victim's family moved to Mount Juliet and the victim's friend obtained her driver's license, she visited the victim's home more than twice per week. She said she lived with the victim and the victim's biological father the previous year.

On redirect examination, the victim's friend testified that she witnessed the Defendant ask the victim to "touch [his penis], to put her mouth on it, or to play with it" while he masturbated. She said the Defendant's masturbating in her and the victim's presence was the only sexual behavior she witnessed. Although she could not recall the number of times this conduct occurred, she said it occurred frequently.

The victim testified that she was born on August 18, 1992, and that she was age nine when her mother married the Defendant in 2001. She said her family lived in an apartment in Nashville before moving to Wilson County in 2007 at the end of ninth grade. When her mother and the Defendant married, she and the victim's brother moved into the Defendant's apartment at the same complex. She said that life was normal in the beginning but that she began to notice the Defendant's staring at her. She said it was "creepy." She recalled one incident in which her mother slept on the sofa with the younger children and the Defendant slept in his bedroom. She said the Defendant asked her if she wanted to sleep in the bed with him, and she agreed. She saw his penis, but she acted as though she was asleep. She was scared and thought it was weird. She agreed to sleep in the bed with the Defendant because she thought he was trying to act as her father. She noted her biological father was not involved in her life at that time.

The victim testified that the next incident she recalled was after the family moved into the second apartment in Davidson County. She thought she was sleeping when the Defendant entered her bedroom. Although she did not recall all the details, she remembered the Defendant's rubbing his penis on her buttocks and holding her mouth closed while she cried. She said she felt lubricant. She did not tell her mother about the incident because she feared her mother might not believe her and thought her mother might "freak out."

-18-

The victim testified that the next incident she recalled occurred downstairs in the same apartment as the previous incident. She said that while she and the Defendant were on the love seat in the living room, the Defendant "forcefully" attempted to have intercourse with her. She said that his penis touched her vagina, although no penetration occurred. She said the Defendant's body was on top of hers. She said that the Defendant always wore shorts with an elastic waistband and that the Defendant pulled out his penis and exposed himself to her. She said her pants were removed, but she did not recall whether her shirt was removed. She screamed, and the Defendant stopped. She did not think anyone else was home.

The victim testified that the next incident occurred in the bathroom of the same apartment. She said that the Defendant was in her bedroom "bothering" her, that she left the bedroom and walked into the bathroom, that the Defendant followed her into the bathroom, and that the Defendant asked her to perform oral sex on him and "swallow." She said everyone else was asleep.

The victim testified that the Defendant's following her was normal behavior. She said the Defendant told her that he would not get in trouble for his conduct, that the police could not do anything to him, and that he would "come after" her if she told anyone. She believed the Defendant because he was scary and mean. She provided testimony consistent with her pretrial hearing testimony relative to the Defendant's demeanor and the Defendant's violent behavior inside the home. She identified a photograph depicting four holes in her bedroom wall and said the Defendant punched the wall during an argument. She said the Defendant also made inappropriate comments about her friends' bodies. The victim said the Defendant often pinched and slapped her buttocks when she walked by him. She said she attempted to ignore the Defendant and walk away from him.

The victim testified that the Defendant's treatment of her brother also caused her to think about what the Defendant would do if she reported the abuse. She said the Defendant treated her brother poorly, was verbally abusive to him, and made him stay in his bedroom frequently. She provided testimony consistent with her pretrial hearing testimony relative to her brother's banishment and the Defendant's disparate treatment of him. She said that although the victim's friend could visit her home, she was not permitted to go to the victim's friend's house.

The victim testified that when the family lived at the apartment complex, she had a few friends over for her birthday. She provided testimony consistent with her pretrial hearing testimony regarding the Defendant's threatening a boy who came to the apartment complex to swim. She said the Defendant yelled at her if she did not have the apartment cleaned each day by the time he arrived home. She said her brother did not have any household responsibilities because the Defendant made her brother stay in his bedroom. She said that if

her brother were in trouble, the Defendant made him sit at the kitchen table and that at family functions, the Defendant made him sit on the sofa.

The victim testified that the Defendant behaved inappropriately when the victim's friend was at their home. She recalled that while she and the victim's friend were using the computer in the living room on one occasion, the Defendant began watching pornography and asked them if they wanted to watch it with him. She recalled another incident when she and the victim's friend went downstairs to get a drink and saw the Defendant watching pornography. The victim recalled one incident when she and the Defendant were sitting on the sofa, and the Defendant turned on pornography without talking. She said she was age nine, ten, or eleven during those incidents.

The victim testified that the Defendant did not apologize for his conduct when the abuse occurred but that he apologized after "everything came out." She said that she was age eighteen when she learned someone other than the victim's friend knew about the Defendant's conduct. She said the victim's friend and another friend told her maternal grandmother about the abuse. The victim was still living at home when she learned the victim's friend reported the abuse. She admitted she became angry because she feared the Defendant would "go crazy." She said that days later, the Defendant kicked her out of the family home during an argument and that she moved into the victim's friend's apartment. She said that in June 2011, Ms. Barcus came to their apartment to discuss the Defendant's conduct and that they went to the Wilson County Sheriff's Department after their discussion. She noted that the Defendant begged her to return to the family home because she helped care for the younger children.

The victim testified that the Defendant sent her a birthday card in August 2011. In the card the Defendant wrote, "I hope you have a great birthday. I also hope that in your heart you can find a way to forgive me. I love you very very much. Daddy." She said that at Detective Weaver's request, she participated in a controlled telephone conversation with the Defendant. She said the Defendant did not make any admissions relative to the abuse, but the Defendant asked her for forgiveness and requested she visit him at the family home. The recording was played for the jury.

In the recording, the Defendant asked the victim why she was calling him. The victim called to find out if he was "okay" with everything that was happening. The Defendant said that he loved her and that she was his daughter. He asked if anyone "put [her] up" to calling him, and the victim said she called him of her own volition. The Defendant said he was not angry at her, and the victim apologized. The victim asked if the Defendant understood what he did wrong, and the Defendant said, "Do you understand what you did wrong?" The victim denied wrongdoing. The Defendant said the victim and her friends were always unclothed in

the house. The victim said they always wore clothes, and the Defendant said the victim and her friends always "dropped towels and showed" him their breasts. The Defendant denied touching the victim and her friends. He accused her of lying because he kicked her out of the house. He said he had the victim's bag of condoms and cigarettes and knew everything she downloaded on the family computer.

The Defendant stated during the conversation that he and the victim's mother needed to get divorced but that nobody had the right to prevent him from seeing his children. The victim said she did not have the power to prevent him from seeing his children. The Defendant accused her of making serious false allegations. The victim said she still loved him and wanted everything to be over. The Defendant told her to tell her mother that they needed a "regular divorce" and to arrange a visitation schedule. He said he forgave the victim but warned what his attorney would do if the victim attempted to testify against him. He said his attorney would make her "look awful." The victim denied wrongdoing. The Defendant said that when his money ran out, "they turned him in" to the police. The victim denied the allegations were connected to his kicking her out of the house. The Defendant said that the matter could have been handled within the family but that Ms. Barcus wanted to be "super b----."

The Defendant denied that anything would occur when the victim's younger sister became old enough to have friends visit the house and said he did not do "that" to the victim and her friends. He told the victim to tell Ms. Barcus that "she is the prettiest kid uncle Ray ever had." He said he knew he was being recorded and what she was "up to."

The victim testified that the Defendant sounded paranoid during the controlled telephone call and that she did not know to what the Defendant referred when he said he had "stuff" on her. She stated that when she lived in the second apartment, she took naked photographs of herself and that she was no older than age eleven when she took them. She said that at some point, the Defendant told her that he had one of the photographs and showed it to her. She did not know what happened to the photograph, but the Defendant did not return it. She thought the Defendant went through her things, found the images on the camera, and printed a photograph.

The victim testified that the incidents to which she testified occurred when she was age nine, ten, or eleven. She recalled one incident when she, the victim's friend, and the Defendant were sitting at the kitchen table. She said that while her friend was on the telephone, the Defendant pulled out his penis and placed it in her friend's face. She also recalled the Defendant's exposing himself to her while her friend was present.

On cross-examination, the victim testified that she was age nine when the Defendant asked her to sleep with him. She said that although his penis was exposed, the Defendant did not touch her that night. She agreed she did not mention the incident in any of her police interviews. Relative to the incident in which the Defendant rubbed his penis on her buttocks, she did not recall how she became naked or how the incident began or ended. She said that although her statement to the police might reflect her mother asked if she had been crying later that night, her mother asked the next morning. Relative to the incidents on the love seat and in the bathroom, she agreed she did not mention the incidents during her police interviews and said she remembered them more recently because she had been forced to think about it.

The victim testified that she screamed during each incident and that the Defendant stopped. She said that although they lived in an apartment, nobody heard her scream. When asked about the time of day at which the incidents occurred, she only recalled that the love seat incident occurred during the day when nobody was home. She said the Defendant struck her while she was sitting on a porch swing. She said that when she was in high school, the Defendant struck her with his fist, causing her to hit the wall.

The victim testified that although she was scared of the Defendant, she defended herself when they argued. She said that the Defendant's kicking her out of the house had nothing to do with any sexual misconduct. She said that she was not doing her chores, that the Defendant told her to get out of his house, and that she left. She denied the Defendant confronted her about the septic tank being clogged with condoms. She denied that anyone other than the victim's friend and the victim's boyfriend came to the house after she graduated from high school. She denied that the Defendant prohibited the victim's friend from coming to the house and that she and the Defendant argued about the victim's friend's coming to the house just before he told the victim to leave his house.

The victim testified that she contacted her biological father after her disclosure to the police and that she currently lived with him, her stepmother, her sisters, and her boyfriend.

On redirect examination, the victim testified that she told the police about the incidents she remembered at the time of the interviews. She agreed she told the police about the Defendant's telling her "to suck it," although she did not recall the details at the time of the interview. She agreed the Defendant's violence escalated as she became older and noted the Defendant did not strike her until she was in high school or create the holes in the walls until she was older. She denied the Defendant agreed to pay her to care for the younger children after the victim graduated from high school. She said it was not her responsibility to ensure the septic tank worked properly. She denied she and the Defendant argued about the

victim's friend or about unauthorized people being at the family home. She said the Defendant permitted her boyfriend at the home most of the time.

Johanna Barendse testified that she was a registered nurse at a hospital and that she worked with the victim's mother and the Defendant. She provided testimony consistent with her pretrial hearing testimony about her duties at the hospital, her professional relationship with the victim's mother and the Defendant, and the events on July 11, 2011. She said that the events surrounding the Defendant at the operating room occurred around 9:30 or 10:00 a.m.

On cross-examination, Ms. Barendse testified that before July 11, the Defendant had not caused any problems at the hospital. She was surprised to learn of the divorce proceedings. She said that she and the victim's mother occasionally attended the same social events. She recalled having dinner with a group of women, including the victim's mother, once or twice per month. She denied the victim's mother discussed any marital problems at the gatherings. On redirect examination, she stated that anytime someone asked the victim's mother about the Defendant in July, she told people that many things were happening and that she could not discuss him. She said the victim's mother never discussed her personal problems.

Wilson County Emergency Management Lieutenant Chad Fresen testified that on July 11, 2011, he responded to a fire at the Defendant's family home in Mount Juliet. When he arrived, signs of fire and smoke were not visible, although the windows were stained. He said that the black windows and doors were caused by smoke and that he concluded a fire had occurred inside the house. Although the fire was extinguished, the home was filled with smoke and had charring on the walls. He said that the main floor had been affected by the fire. Investigators found a gasoline can just inside the front door. Lieutenant Fresen said that the fire might have spanned an hour depending upon the items inside the house, the fuel used, the heat, and the amount of oxygen inside. He said nobody was inside the house when the firemen arrived.

On cross-examination, Lieutenant Fresen testified that he arrived at the scene at 7:21 p.m. He talked to Detective Lee Bridges and other deputies from the sheriff's office at the scene. He said that if the fire burned much longer than an hour, the home would have "been on the ground" but conceded that he was not an expert and that the fire could have spanned several hours.

Wilson County Sheriff's Detective Lee Bridges testified that he investigated the fire at the Defendant's family home. He said the fire inside the house appeared to have extinguished on its own because the windows and doors were closed. He spoke to the

victim's mother and maternal grandmother. He said it was unusual to find black windows and doors without the exterior of the home catching fire. He identified photographs of the damage to the home, which depicted extensive fire damage to the first level of the home. He noticed that a gasoline can was found inside the home and that an unidentifiable item was plugged into the wall.

Detective Bridges testified that the origin of the fire was at the base of the stairs and that gasoline was used as an accelerant. He said the item plugged into the wall appeared to have been the source of ignition, although he could not make a conclusive determination. He said that the person who started the fire was knowledgeable about "electrical things" and knew how to wire the device in a way to allow the person to leave the home before the fire ignited. He noted the gasoline can was located near the item plugged into the wall. He said the gasoline burned quickly and was so hot that it depleted the oxygen inside the house.

Detective Bridges testified that he interviewed the Defendant regarding the fire. The Defendant claimed he did not remember anything about the fire. The Defendant said he had been taking medications that had caused him to act irrationally. He said he learned of the fire during the divorce proceedings. The detective agreed the Defendant did not deny any involvement in the fire and said the Defendant only said he did not remember anything because of the medications. The Defendant had not been charged criminally for the fire, although arson was its cause. Detective Bridges said the Defendant told him that the victim's mother's family might have been responsible.

Detective Bridges testified that he interviewed the victim's mother and determined she was in another county at the time of the fire. He said that the Defendant, the victim's mother, and possibly a third person had keys to the home and that he confirmed the third person was elsewhere at the time of the fire.

On cross-examination, Detective Bridges testified that the doors were locked when the fire department arrived and that the victim's mother provided the firemen with a key. He said that the home did not appear to be "out of order." He said he had assistance from the "State Bomb and Arson" department. He said his estimation about how long the fire burned was based on his observations and his conversations with the state investigator. He said that gasoline was poured near and around the stairs and that the fire began with the item plugged into the wall or by someone using a lighter or match. He said the matter was still pending because nobody had been prosecuted.

Detective Bridges testified that he did not investigate the Defendant's medications and did not know if they might have caused memory loss. He said he interviewed other family members but did not recall their names. He recalled talking to the victim and the victim's brother.

On redirect examination, Detective Bridges testified that no evidence showed any signs of forced entry and that no evidence suggested the fire was started by someone who did not live in the house. He said nothing appeared to have been missing or stolen. He said that when the Defendant said his medications caused memory loss, the Defendant removed a newspaper clipping from his pocket. The clipping stated the Defendant's medications would interact to cause him "to act crazy." On recross-examination, Detective Bridges agreed the Defendant did not admit starting the fire.

Christie Barcus, the Defendant's sister, testified that she had a close relationship with the victim, the victim's mother, and the victim's maternal grandparents. She provided testimony consistent with her pretrial hearing testimony relative to her learning of the alleged sexual abuse, her discussing the allegations with the victim and the victim's friend, and her driving the victim and the victim's friend to the Wilson County Sheriff's Department.

Ms. Barcus testified that she told the victim's mother about the allegations on May 31, 2011, after the Defendant left for work. She said the victim's mother fell to the floor when Ms. Barcus told her the allegations. She helped the victim's mother pack a few belongings for herself and the children, and the women drove to Ms. Lancaster's house.

Ms. Barcus testified that she talked to the Defendant on May 31, 2011. The Defendant said that "the girls . . . run around half-dressed in bikinis and he's just a man." She provided testimony consistent with her pretrial hearing testimony about the Defendant's suicidal thoughts and her request that he seek medical treatment. She said the Defendant did not accuse her of "putting the girls up" to making the allegations against him.

Ms. Barcus testified that she brought the Defendant clothes and various items he needed while in the treatment program and that the Defendant was grateful for the help. She said that the victim's mother and the children stayed at the family home while the Defendant received treatment, although the victim continued living with the victim's friend. She said the victim's mother and the children moved to the victim's maternal grandmother's house after the Defendant was released from treatment. She said the family planned for the Defendant and his father to stay at the Defendant's family home after his release from treatment. She recalled their father stayed with the Defendant for about one week. She received a text message from the Defendant on June 24, 2011, and she knew their father had returned home by that time. She provided testimony consistent with her pretrial hearing

-25-

testimony regarding the threatening contents of the text messages. She was provided documents relative to text messages from her cell phone. She identified her text message records and read several July 24 messages to the jury. The Defendant sent her messages stating that he was not a monster, that he loved his children, and that Ms. Barcus was a "home-wrecking b----." Ms. Barcus told the Defendant not to contact her again, and the Defendant stated, "From what I heard you were not raped, you wanted it." Ms. Barcus stated that she would call the police if he contacted her again. The Defendant replied, "Go ahead and die b----." The Defendant insulted her husband and told her to send her husband to see him. Ms. Barcus asked, "[W]hat are you going to do kill us? You must be drinking again." The Defendant stated, "You are stupid. I'm going to put you and [the victim] on the stand in Court and show you are a witch and she is a s---."

Ms. Barcus testified that the Defendant sent her text messages again on July 1. The Defendant stated, "I know your real father's name." Ms. Barcus did not understand because she and the Defendant had the same father, and she asked the Defendant what he meant. The Defendant stated, "Ask your s--- mother." Ms. Barcus told the Defendant to leave her alone, and she stated she was going to obtain an arrest warrant against the Defendant for harassment. The Defendant continued to imply someone else was Ms. Barcus's biological father. He stated that the victim's friend performed oral sex for $20 and that the victim was paid for sexual intercourse. He claimed he had a video recording to support his statement. Ms. Barcus provided testimony consistent with her pretrial hearing testimony regarding text messages from the Defendant claiming to be in her backyard and wanting to urinate on her grave. She said that on July 7, she received the last text message from the Defendant in which the Defendant mentioned one of her previous sexual relationships. She agreed that the subject matter was unrelated to the present case and that the Defendant only wanted to insult her.

Ms. Barcus testified that the Defendant did not contact her after he was served with the order of protection. She said that on July 11, she learned the Defendant had threatened the victim's mother's life. She provided testimony consistent with her pretrial hearing testimony regarding her involvement in picking up the victim's siblings from the maternal grandparents' house and the victim's mother from work.

Ms. Barcus testified that the Defendant's treatment of the victim's brother concerned everyone in the family. She recalled that the Defendant prohibited the victim's brother from participating in trick-or-treating at Halloween and that the victim's brother could not eat at family gatherings until everyone else had eaten. She did not witness any physical abuse, though. She said the Defendant's explanation for his harsh treatment was the victim's brother's poor academic performance and behavior at school. She said that this treatment began before the adoption but that it was intermittent until after the adoption was finalized.

She said, though, the victim's brother participated in events the Defendant did not attend. Relative to the victim's mother, Ms. Barcus noticed that the victim's mother was not allowed to make decisions regarding the children.

Ms. Barcus testified that although she never saw the Defendant act violently with the victim, the victim's brother, or the victim's mother, the Defendant had been violent with her, their brother Greg, and their parents. She said, though, the Defendant was a different person after his release from the Army.

On cross-examination, Ms. Barcus provided testimony consistent with her pretrial hearing testimony regarding her assisting the victim's mother during the divorce proceedings. She denied having a conversation with the Defendant's father regarding the Defendant not being allowed to visit his children. She said she provided the prosecutor with her text message records. She knew that the Defendant was injured while at work, although she did not know when, that the Defendant underwent two surgeries, and that he received a worker's compensation settlement.

Judy Lancaster testified that she met the victim's mother in 2000 or 2001 and that the Defendant was determined to kill the victim's biological father because the Defendant thought he was "a bad person." She said the Defendant and the victim's mother's relationship otherwise seemed normal, except for the Defendant's treatment of the victim's brother. She provided testimony consistent with her pretrial hearing testimony regarding the Defendant's treatment of the victim's brother. She confronted the Defendant about the victim's brother, and the Defendant explained his treatment was related to the victim's brother's poor academic performance. However, Ms. Lancaster said the Defendant's treatment of the victim's brother continued during the summertime, and the Defendant had no explanation for his treatment outside the school year. She believed the Defendant hated the victim's brother.

Ms. Lancaster testified that she learned of the sexual abuse allegations on May 23, 2011, from Ms. Barcus. She provided testimony consistent with her pretrial hearing testimony regarding her actions after learning the allegations and her taking the victim and the victim's friend to the sheriff's department. She did not know the details of the allegations, was not interviewed by the police, and did not contact the Defendant after she learned of the allegations. She did, however, assist in arranging for the Defendant's father to stay at the Defendant's family home upon his release from alcohol treatment.

Ms. Lancaster testified that after the Defendant's release from alcohol treatment and his father's return home, she received text and voicemail messages from the Defendant. In the first message, the Defendant accused Ms. Lancaster and her childhood friend of inserting

vibrators in his buttocks when he was an infant. On June 24, she spoke to the Defendant on the telephone, and she said the Defendant accused the victim and the victim's friend of fabricating the allegations. The Defendant told Ms. Lancaster that he hated her and always had hated her. She provided testimony consistent with her pretrial hearing testimony regarding the Defendant's threats related to her developing Alzheimer's disease and his threatening to harass her until she died. She said the Defendant threatened to slit her throat if she did not have a "long struggling death" with the disease. She unplugged the telephones because the Defendant continued calling and hanging up. She called the police to report the Defendant's threats and said she believed the Defendant would attempt to hurt her. She provided testimony consistent with her pretrial hearing testimony regarding his accusing her of child abuse.

Ms. Lancaster testified that her next communication with the Defendant was on July 4, after a holiday celebration. They talked on the telephone for about twenty minutes, and she said the conversation was normal until the Defendant stated, "[I]f you [were] just standing in here in front of me right now I would just slit your throat from side-to-side. I'd blow your f'ing head off." She said that during the conversation, she expressed her belief in the sexual abuse allegations and that the Defendant claimed the victim and her friends performed oral sex on him anytime he wanted in exchange for $20. She said she had no further communication with the Defendant after July 4.

Ms. Lancaster testified that on July 11, she was told the Defendant was traveling to the hospital to find and hurt the victim's mother. Ms. and Mr. Lancaster drove to the hospital, picked up the victim's mother, and left the hospital. She said that the victim's mother received a text message not long after leaving the hospital stating that the Defendant was there looking for her, was not dressed in work attire, and had sharp knives in his pants pocket. Ms. Lancaster said they drove to the victim's maternal grandparents' house, picked up the victim's grandfather, and drove to the police station. She said that while at the victim's grandparents' house, she saw that a minivan had been driven into the house. Inside the van she saw various orders of protection that family members had obtained against the Defendant, possibly the divorce documents, and the empty packaging that had held knives. She said that a police officer brought the Defendant inside the police station while she and the others were completing a report about the day's events. She did not speak to the Defendant.

Ms. Lancaster testified that the Defendant drank alcohol frequently and that he drank beer at family gatherings. She said the victim's brother's job was to carry the Defendant's cooler of beer at family events. Although the Defendant never became violent at family gatherings, she recalled the Defendant had "put his hands" on her, Ms. Barcus, and her other son Greg. She said that when the Defendant was enraged, he threw things and clinched his

-28-

fists, he hit walls and doors with his fists, he had enlarged eyes, his top lip disappeared, and his voice became "like a raging bull."

On cross-examination, Ms. Lancaster testified that the Defendant was angry with her because she believed the sexual abuse allegations and because she sent the Defendant's father an email about her belief that no reasonable mother would allow the Defendant to have contact with the children. She said that the Defendant was stationed at a military base in Germany when the Defendant's father filed for divorce. She said that although she went to the police station with the victim and the victim's friend, she did not contact the Defendant about the allegations.

Ms. Lancaster testified relative to the Defendant's treatment of the victim's brother that the family discussed how to improve the victim's brother's academic performance, including special classes and a tutor, but nothing was done. She was knowledgeable about the Defendant's previous work-related injury and said the Defendant was "scary" during the year-long recovery. She did not know why the Defendant asked the victim to leave the family home.

Ms. Lancaster testified that she arrived at the hospital before noon to pick up the victim's mother from work. She said that after she and her husband picked up the victim's maternal grandfather, they drove to the victim's mother's brother's house to check on the victim's brother and his two cousins, who were home alone. She said they wanted to ensure their safety because nobody knew the Defendant's whereabouts. She said a policeman came to the house, too, ensuring the victim's brother's safety. Ms. Lancaster, her husband, and the victim's maternal grandfather left the victim's brother and his cousins at the home and instructed them not to answer the door.

On redirect examination, Ms. Lancaster testified that the victim's brother was about two years younger than the victim and that he was age seventeen at the time of the trial. She identified her email to the Defendant's father and the order of protection she obtained against the Defendant. She read to the jury a portion of the order of protection related to the Defendant's telephone call during which he threatened to cut her throat, "blow off" her head, and harass her until her death.

The victim's maternal grandmother testified that in April 2011, the victim's friend and another friend talked to her about the Defendant's inappropriate behavior with the victim. Upon learning the allegations, she unsuccessfully attempted to have the victim's friend talk to the victim's mother. The victim's grandmother talked to Ms. Barcus in May 2011 about the allegations, and as a result, Ms. Barcus took the victim and the victim's friend to the police station. After the girls spoke to the detective in Wilson County, the victim's mother

and the three youngest children moved in with the victim's grandmother. The victim lived at the victim's friend's apartment, and the victim's brother lived with his uncle. She said that by the time the victim's mother and the children moved in with her and her husband, an order of protection restrained the Defendant from having contact with the victim's mother and all five of the children until a July 14 court date.

The victim's grandmother provided testimony consistent with her pretrial hearing testimony relative to the events on July 10 and 11 regarding the Defendant's telephone calls and threatening voicemail messages, driving the minivan into the side of her house, and placing a large landscape rock on her minivan. She also provided testimony consistent with her pretrial hearing testimony regarding the animals that were dropped off at her house during the middle of the night, the Defendant's threatening to hurt the victim's mother, and Ms. Barcus's picking up the victim's mother from work.

On cross-examination, the victim's grandmother testified that she cared for the children when the victim's mother and the Defendant worked. She said she usually cared for the children until 4:00 p.m. during the week. She saw the victim's mother and the three youngest children almost every weekend and said she saw the victim and the victim's brother when the Defendant allowed them to come to her house on the weekend.

The victim's grandmother testified that she saw the Defendant on birthday and holiday gatherings and that the Defendant was nice. She agreed she was not scared the Defendant would hurt her until his threats on July 10 and 11 but said she was "leery of him" because of how the Defendant treated the victim's brother. She agreed she did not witness the Defendant physically abuse the victim's brother. She said that after taking the victim's mother to work on July 11, she stopped at her son's house to see the victim's brother and that she allowed the victim's brother to listen to the Defendant's voicemail messages. She said after she obtained the order of protection, the police drove to where the victim's brother and her two other grandsons were staying.

On redirect examination, the victim's grandmother testified that she suspected something was wrong with the victim and the Defendant's relationship. She recalled the Defendant's keeping the victim home from school on multiple occasions without justification. She said the Defendant made the victim stay home alone with him while the victim's mother took the other children to various events and places.

The victim's maternal grandfather testified that before July 11, 2011, he usually saw the Defendant at holiday and birthday gatherings and that the Defendant's demeanor was normal on those occasions. He said that after he learned of the sexual abuse allegations, the victim's mother and the three youngest children moved into his house in June 2011. He

recalled one morning when he found a cage of rabbits and a small dog outside his house, which had been left overnight. He said the animals were at the Defendant and the victim's mother's house in Mount Juliet. He said that no arrangements were made for the animals to be delivered to his house, that he had not spoken to the Defendant, and that the Defendant was living at the Mount Juliet home with the animals.

The victim's grandfather provided testimony consistent with his pretrial hearing testimony regarding the events on July 10 and 11 relative to the Defendant's threatening voicemail messages, the Defendant's coming to his house and taking a minivan, his wife's taking the victim's mother to work on July 11, the Defendant's returning to his house and banging on the front door, the Defendant's attempting to open the garage door and placing a large landscape rock on the victim's grandmother's minivan, the victim's grandmother's leaving with the police to obtain an order of protection against the Defendant, and Ms. Barcus's driving to the hospital to pick up the victim's mother from work after the Defendant threatened to hurt the victim's mother. The victim's grandfather also provided testimony consistent with his pretrial hearing testimony regarding the Defendant's crashing a minivan into the side of his house and driving away in the Defendant's truck that had been parked outside the previous night. He identified photographs of his house showing the minivan after it had been driven into the side of the house.

The victim's grandfather testified that he looked inside the minivan that had been driven into the side of his house and saw a cell phone and a wallet on the driver's seat and packaging for fillet knives and sharpeners on the floorboard. He learned later that the wallet and cell phone belonged to the Defendant. He provided testimony consistent with his pretrial hearing testimony about obtaining an order of protection and Officer Boone's arresting the Defendant.

On cross-examination, the victim's grandfather testified that at family gatherings, the victim's brother was subdued and recalled that the victim's brother was required to sit beside the Defendant and could not get up. The victim's grandfather did not hear the Defendant tell the victim's brother not to get up and agreed the victim's brother did not appear to be hurt. The victim's grandfather did not recall the victim's brother and the victim coming to his house on Saturday nights with the victim's mother and the younger children after the family moved to Mount Juliet. He said that although the victim's mother's previous husband did not want a divorce, the proceedings were amicable and without violence. He agreed the rabbits and dog delivered by the Defendant during the middle of the night were unharmed.

The victim's mother testified that she met the Defendant in 2001, while they worked at the same hospital. She was married to the victim and the victim's brother's biological father at the time she met the Defendant, although she was attempting to leave the marriage.

She said that after she and the Defendant were married, the Defendant adopted her children. She said that before the marriage, she and the Defendant lived at the same apartment complex but in different apartments and that after they married, she, the Defendant, the victim, and the victim's brother moved into a larger apartment at the same complex. She said that in the beginning of the marriage, the victim and the victim's brother continued to have contact with their biological father but that conflict arose between the Defendant and the children's father because the Defendant did not want the children exposed to the woman their father began dating. She said that eventually the victim and the victim's brother had no contact with their biological father. She said that the Defendant wanted to terminate the children's father's parental rights and that they were advised termination could not occur unless someone adopted them. She said the Defendant made the decision to terminate the children's father's parental rights and to adopt the children.

The victim's mother testified that although conflict existed between the Defendant, the victim, and the victim's brother, "life was good" in the beginning. The victim's mother had two additional children by 2002. She said that the home environment deteriorated when the Defendant began drinking alcohol and that the Defendant's anger level coincided with the amount of alcohol he consumed. She said that if the Defendant consumed a large amount of alcohol, any small thing might agitate the Defendant. She recalled many of her and the Defendant's arguments related to the victim's brother. She said the Defendant told her that he would make the parenting decisions relative to the victim and the victim's brother. She said that in 2002, the victim was age ten and the victim's brother was age eight.

The victim's mother testified that although the Defendant never abused her physically, the Defendant threw things, punched holes in the walls, broke things, and threatened her when he became angry. She said the Defendant stated that he was in charge of the children, that she could call the police if she wanted, that he would not get in trouble, and that he would never be "taken down" by anyone. She recalled the Defendant's repeated threats to burn down the house if she did not clean it. She said the Defendant did not like for the victim to go to her friends' houses. She said that the Defendant occasionally prohibited the victim from attending school and recalled that the Defendant did not want the victim to attend school on days he was home and the victim's mother worked. She recalled that the Defendant prohibited the victim from attending school while he was recuperating from his two surgeries and that his reason was he needed someone to care for him. She said that the victim's brother was always in trouble and that the Defendant did not allow the victim's brother to have electronics. The Defendant sent the victim's brother to his room frequently or told the victim's brother to sit at the kitchen table. The Defendant turned off the electricity to the victim's brother's room, sent the victim's brother to bed without dinner, and prohibited the victim's brother from playing with the other children. The victim's mother said the

Defendant explained his treatment of the victim's brother was due to the victim's brother's causing trouble and needing punishment.

The victim's mother testified that in May 2011, Ms. Barcus told her about the sexual abuse allegations. The victim's mother was at home when she learned of the allegations, and she gathered belongings for the younger children. The victim had already moved out of the family home and had said the Defendant told the victim not to return if she left with the victim's friend. The victim's mother was not home when the Defendant kicked out the victim. After learning the allegations, she stayed at Ms. Barcus's home for one night and then stayed with her parents, but once the Defendant entered a treatment program, the victim's mother and the younger children returned to the family home.

The victim's mother testified that she filed a complaint for divorce and sought a restraining order on June 3. She said that the Defendant sought treatment for alcoholism and that while the Defendant received treatment, he said he was scared, did not want to dissolve the marriage, and would stop drinking. The Defendant did not accuse the victim's mother of fabricating the sexual abuse allegations for the purpose of obtaining a favorable outcome in the divorce proceedings. She spoke with the Defendant's father, who was supportive and ensured she had sufficient income to support the children.

The victim's mother testified that she previously suspected that the Defendant was engaged in inappropriate behavior with the victim. She recalled one incident when she was pregnant with her fourth child in which she fell asleep downstairs. She awoke and went upstairs to find the victim coming out of the one-half bathroom adjacent to her and the Defendant's bedroom while the Defendant was lying on his back on the bed. She said the victim was naked but was covered with a towel. The victim's mother told the victim to get dressed and go to bed. The Defendant had been drinking, and the victim's mother asked the Defendant what occurred. The Defendant explained that he asked the victim if she had ever seen a penis, that the victim said she had not, and that he showed the victim his penis. She said that the Defendant said he had been drinking and that the incident was not a big deal. The next day the Defendant took the family shopping for nursery furniture. She denied talking to the victim about the incident.

The victim's mother testified that the Defendant had also exposed himself to the victim on other occasions. She recalled incidents when the Defendant walked into a room in which she and the victim were located. She said the Defendant was naked and "stroked himself." When asked if the Defendant was drinking alcohol when those incidents occurred, she said the Defendant always drank. She confronted the Defendant about his conduct, and the Defendant claimed relative to the first few incidents that he drank too much. She said, though, the Defendant began to think his conduct was not a "big deal."

The victim's mother testified that when she took her younger daughter to dance classes, the Defendant required the victim to stay home with him. She said the Defendant explained that she and her younger daughter needed one-on-one time. She also recalled the Defendant prohibited the victim from attending the victim's brother's school band concert. She said the Defendant did not attend school functions. Relative to the day of the band concert, she recalled the Defendant's telling her to bring home feminine products for the victim because she began menstruation. The victim's mother thought it was odd the Defendant and the victim would discuss the topic. The victim's mother stated that the victim's brother's school performance was poor but that the Defendant did not assist the victim's brother with his homework or attempt to hire a tutor. She said the Defendant did not want her to help the victim's brother with his schoolwork.

The victim's mother testified that over time, the Defendant's drinking alcohol increased and that the family fights escalated, although the drinking and fighting did not occur at family gatherings. She identified a photograph of the victim's bedroom depicting four holes in the wall. She recalled that the holes were created during different incidents and that during one incident, she came upstairs to find the victim standing on her bed and the Defendant yelling at and threatening the victim. The victim's mother recalled one incident in which the Defendant punched holes in another wall because she returned home late.

The victim's mother testified that when she and the three youngest children stayed at her parents' house, the Defendant delivered the family rabbits and a puppy during the middle of the night while everyone slept. She said her last communication with the Defendant's father was around June 24. She said the Defendant's father asked if the Defendant might be able to visit the children. She told the Defendant's father that the Defendant needed to speak with his attorney because a restraining order existed. She thought the rabbits and puppy were delivered after her last communication with the Defendant's father.

The victim's mother testified that on July 10, the Defendant began leaving voicemail messages on her mother's cell phone. Her mother told her about the content of the messages and said the victim's mother became scared. At some point during the middle of the night, her mother woke her because the Defendant was in the yard. The victim's mother called 9-1-1. She said the Defendant parked his truck, walked to the backyard, entered her minivan, and left. She provided testimony consistent with her pretrial hearing testimony relative to the events on July 11, including going to and leaving work, the Defendant's looking for her at the hospital, her minivan being driven into her parents' house, and her looking inside the van and seeing the Defendant's wallet, his keys, and packaging for knives she had not purchased and had never seen. She said her mother always cared for the three youngest children when she worked. She said the Defendant had previously threatened his mother with a knife.

-34-

The victim's mother testified that after the Defendant's arrest, she, her mother, and her sister returned to her and the Defendant's family home. When they arrived, the dogs were in the backyard, and the house windows were black. She said the dogs were kept inside when nobody was home. At that time, only the Defendant and the victim's mother had keys to the house. She said almost everything inside the house sustained smoke damage. She recalled that the Defendant had a large fish tank inside the house and that the tank was at the house when she left the home after learning of the sexual abuse allegations but was missing on the day of the fire. She recalled that the Defendant had "suitcase type things" he told her never to open and that the suitcases were open on the day of the fire. She saw some papers inside but did not consider them important. She recalled the insurance company paid for her and the children's belongings but refused to pay for the Defendant's belongings. She said the Defendant never took medication for behavioral issues or depression during the course of their marriage.

On cross-examination, the victim's mother testified that during the divorce proceedings with the victim's biological father, she obtained an order of protection. She recalled the victim's biological father threatened her attorney's assistant, and her attorney obtained the order of protection. Although she denied the victim's biological father abused her physically, she agreed that he prevented her from leaving their home once and that she alleged assaultive behavior in the application for an order of protection.

The victim's mother testified that the victim's brother's teachers believed he was capable of doing the work but that the victim's brother was unmotivated. The victim's mother did not recall the victim's brother's turning over furniture. She agreed that the Defendant received a worker's compensation settlement relative to his work-related injuries and that the Defendant bought a lawn mower, a fence for the backyard, and a swimming pool. Although she agreed the money had been spent, she denied the timing of the allegations coincided with the Defendant's spending the money. She agreed that the Defendant took care of the rabbits and the puppy delivered to her parents' house and that the delivery occurred before she told the Defendant's father that the Defendant needed to contact his attorney about visiting the children. The victim's mother said the Defendant's behavior escalated after her last communication with the Defendant's father.

The victim's mother testified that the victim wanted to go to her sister's dance classes and that the victim expressed interest in going after the incident in which she found the victim in the bathroom wearing only a towel. The victim's mother said the Defendant's entering the room naked and stroking himself in the victim's presence happened much later. The victim's mother admitted that she did not tell the police officers during her first interview about the first incident she witnessed. She denied she and the Defendant watched pornography and said she did not think the Defendant watched it.

The victim's mother testified that she went to her parents' house on the weekends when the Defendant watched sporting events and drank beer at home. The victim's mother agreed the victim's friend was at their house frequently. She said the victim did not go to the victim's friend's house often, although the victim's mother had no reason to prevent the victim from going there. She denied that the victim's friend was a bad influence on the victim and that the victim's friend attempted to sneak people in and out of the house. She agreed, though, that a boy was at their house while she and the Defendant were not home. She agreed that the victim had two or three boyfriends over the years and that the boyfriends were allowed to come to their house occasionally. She said the Defendant had to approve a boyfriend's coming to the house.

The victim's mother testified that the victim and the victim's brother were normal teenagers with age-appropriate problems. She agreed the victim's brother did not do his homework, but she said he did some of it. She said the Defendant always grounded the victim's brother, although it was not always for homework-related reasons. She said the victim's brother was also grounded for not doing chores and getting in trouble at school. She said the victim's brother's behavior could have been his way of rebelling. Although she did not recall the details, she remembered the Defendant's waking the victim's brother and "being rough with" him.

The victim's mother testified that the victim was not absent excessively from school due to the Defendant's wanting her to remain at home. She admitted that she spoke to the victim and the victim's brother's biological father occasionally and that the victim lived with him at the time of the trial. The victim's mother said the victim's brother lived with her. She said they took family vacations and went camping about five times. She thought that the Defendant cared about the children and that fatherhood was important to him. She did not know if the Defendant's harsh treatment of the victim's brother was an attempt to help the victim's brother perform better in school. She said, though, that the Defendant's harsh treatment was the reason the victim's brother performed poorly in school.

The victim's mother testified that the Defendant called her while he received inpatient treatment and that the conversation was civil. She did not recall discussing the children during the conversation. She agreed she might not have told Detective Weaver about the Defendant's stroking himself, but she denied changing her statement. On redirect examination, she stated that she felt guilty about leaving the children with the Defendant after she suspected inappropriate conduct and that her guilt prevented her from telling the detective everything she knew.

Robin Sargent testified for the defense that he worked with the Defendant and the victim's mother at the hospital and that he had known the Defendant for about ten or fifteen years. He said the victim's mother worked for him in the operating room for about twelve years before he moved to the quality department. Mr. Sargent said that he never saw the Defendant "appear to domineer[]" the victim's mother and that the couple seemed to get along well.

The victim's brother testified that he and the Defendant did not get along well. He admitted that they did not like one another and that he did not accept the Defendant as his father but "came to terms with it." He said he rebelled by not doing what he was told and by not doing his homework, which backfired because he was grounded frequently when he was young. He said that his performance in school was good in the beginning but that he gave up because he had nothing for which to work. He said the Defendant did not encourage him to perform better in school. His mother attempted to talk to him about school, but he admitted he was "hard-headed." He said the Defendant attempted to make him do his homework by punishing him, which caused him to become angrier over time.

On cross-examination, the victim's brother testified that he and the Defendant were not close, although the idea of having a close father figure was appealing. The victim's brother said that in the beginning, the Defendant was kind to him. He said that being grounded involved no contact with the outside world. He was not permitted to have video games and did not have a telephone to call his friends until he was sixteen years old. He was not permitted to invite friends home and was often sent to his bedroom for no reason. He recalled that he had to sit at the kitchen table for an extended time and that he was not permitted to leave. He agreed he was sent to his bedroom without dinner but said someone would bring food to his bedroom.

The victim's brother testified that the only activity he enjoyed when he was younger was playing guitar and playing his Nintendo Gameboy and that the Defendant took them away. The victim's brother recalled finding nude photographs of the victim in his mother and the Defendant's bathroom. He did not report what he saw until after the victim disclosed the alleged abuse to the police.

The victim's brother testified that he overheard the Defendant physically abusing the victim. He recalled one incident in which he awoke to the Defendant's striking him. He said that over time he complied with the Defendant's rules of sitting on the sofa and at the kitchen table and going to his bedroom because he was afraid of the Defendant. When asked if anyone in the family attempted to defend him, he said everyone was afraid of the Defendant.

-37-

On redirect examination, the victim's brother testified that the Defendant smashed some of his guitars, although he did not recall why the Defendant destroyed them. Regarding the nude photographs of the victim, he said that he did not know who took them and that he did not have them. On recross-examination, he said that the Defendant's harsh treatment occurred before his grades fell. He agreed the Defendant was the cause, not the solution, of his poor grades.

Harold Turner testified that he worked with the Defendant's brother and that he had known the Defendant for about twenty-five years. He was a family friend and attended family functions at least three times per year. He said he never saw the Defendant act inappropriately toward anyone or treat one member of the family more harshly than another. Mr. Turner also went camping with the family once per year and said the Defendant treated everyone the same. He denied seeing the Defendant "really drunk."

Franklin Arnold, the Defendant's father, testified that after he divorced the Defendant's mother, he developed a concern regarding her treatment of the Defendant. He said Ms. Lancaster was cold toward the Defendant and picked on him more than the other children. He thought Ms. Lancaster was jealous of their close relationship. He never saw the Defendant strike Ms. Lancaster and said the Defendant never struck him.

Mr. Arnold testified that after the Defendant was released from the inpatient treatment program, he picked up the Defendant from the hospital and stayed with him for a few days. He said the Defendant cleaned the house for most of the week because the dogs had been left inside the house and had destroyed it. The Defendant also worked in the yard, went to a couple of doctor's appointments, and obtained an attorney for the divorce proceedings. He said that Ms. Barcus called every couple of hours to learn the Defendant's "every move." Mr. Arnold considered it harassment, but he attempted to reassure Ms. Barcus that the Defendant was fine.

Mr. Arnold testified that the Defendant's most pressing concern was visiting his children and that he and his other son unsuccessfully attempted to arrange a meeting with the children. He said that to his knowledge, the Defendant did not speak to any of his children while he stayed with the Defendant. He said that he did not know a restraining order prevented the Defendant from having contact with the children and that he still did not know if a restraining order ever existed.

Mr. Arnold testified that until 2010, he probably visited the Defendant and the victim's mother two or three times per year. He said the family seemed happy, although their lives were hectic. He never saw the Defendant "domineer[]" the victim's mother and said the Defendant was a dedicated father to the three younger children. Regarding the victim and the

victim's brother, he said he did not see "anything wrong going on there."  He did not think the victim's brother spent most of the time in his bedroom and said the victim was quiet but pleasant.

On cross-examination, Mr. Arnold testified that Ms. Lancaster wanted him to treat her like a child, although he attempted to treat her like an adult.  He said that he and Ms. Lancaster had a "division of responsibility" in the household.  He said he gave his paychecks to Ms. Lancaster without looking at the amount of the checks, although she was incapable of balancing a checkbook.  He questioned whether Ms. Barcus was his biological daughter.  He said most of his involvement with the family while the Defendant received treatment was coordinated through Ms. Barcus.  He said he was not permitted to talk to the victim's mother.  When presented with email communications between him and the victim's mother, he could not recall if the emails were sent before or after he returned home to Kentucky.  He agreed he helped contribute to the cost of the victim's mother's attorney fees for the divorce and said he initially thought the victim's mother was in a bad situation but learned later that he needed to help the Defendant.

Mr. Arnold testified that although he did not consider the Defendant violent, the Defendant had legal trouble thirty years previously for vandalism.  He did not recall sending the victim's mother an email after the house fire and other incidents apologizing for the Defendant's conduct.

Donna Elizandro testified that the Defendant and the victim's mother were her neighbors for about four years in Mount Juliet.  Ms. Elizandro saw the Defendant more frequently than the victim's mother because Ms. Elizandro and the Defendant both liked yard work.  Ms. Elizandro said the victim's brother and the other children helped the Defendant. She said the Defendant and the victim's brother appeared to have a normal stepfather-stepson relationship.  She said the children's friends came to the family home frequently.  She believed that at times, the victim's friends were at the house when the victim's mother and the Defendant were not home.  Ms. Elizandro recalled an incident in which one of the victim's friends crawled out an upstairs window in the victim's bedroom and onto the porch roof.  She recalled that on several occasions, she saw a car full of teenagers pull into the victim's mother and the Defendant's driveway after the adults left for work.  Ms. Elizandro talked to the Defendant about what she saw and expressed her concern.

Ms. Elizandro testified that the Defendant and his family appeared loving and that the Defendant showed concern for all the children.  She never saw the Defendant intoxicated or treat the victim's brother differently from the other children.

Upon this evidence, the Defendant was convicted of two counts of aggravated sexual battery and solicitation of a minor. The trial court sentenced the Defendant an effective twenty-seven-year sentence. This appeal followed.

## Admissibility of Evidence

The Defendant contends that the trial court erred by permitting the State to present evidence of the Defendant's conduct on July 10 and 11, 2011. He argues that the evidence was prejudicial and irrelevant to any contested issue at the trial and that the evidence violated Tennessee Rule of Evidence 404(b) and principles of due process. The Defendant's contention focuses on the testimony of Officer Boone, the victim's mother, the victim's maternal grandparents, the Defendant's mother and sister, Officer Fresen, and Detective Bridges. The Defendant, likewise, argues that the court failed to provide contemporaneous and final jury instructions regarding the proper use of the evidence. The State contends that the evidence was properly admitted.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Tennessee Rule of Evidence 404(b) prohibits the admission of evidence related to other crimes, wrongs, or acts offered to show a character trait in order to establish that a defendant acted in conformity with the trait. Tenn. R. Evid. 404(b). Such evidence, though, "may . . . be admissible for other purposes," including, but not limited to, establishing identity, motive, common scheme or plan, intent, or absence of mistake. *Id*.; *see State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). Before a trial court determines the admissibility of such evidence,

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4). The standard of review is an abuse of discretion, provided a trial court substantially complies with the procedural requirements. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *see State v. Electroplating, Inc.*, 990 S.W.2d 211 (Tenn. Crim. App. 1998).

After the pretrial motion hearing, the trial court entered a written order granting the State's motion to present the relevant evidence. The court also granted the State's motion to present evidence of the Defendant's intimidation and control of the family before the victim's disclosure to the police.

Relative to Officer Boone's testimony, the trial court found that his testimony clearly and convincingly proved that on July 11, the Defendant crashed the family minivan into the side of the victim's maternal grandparents' house and that the Defendant made several statements to Officer Boone at the time of his arrest. The court found that the evidence was relevant to multiple material issues at the trial, including providing the jury with a complete story of the crime. The court found Officer Boone's testimony tended to establish that the Defendant acted to suppress any testimony from the victim, the victim's mother, the victim's siblings, and anyone else whom he believed might testify against him. The court found that the evidence provided an inference that he was threatening the victim's mother and her family to prevent them from speaking to the police. Likewise, the court found that the victim's credibility was a critical issue and that Officer Boone's testimony supported her claim that she feared the Defendant, which resulted in the victim's delaying her disclosure. The court found that the probative value of the testimony was high and that the probative value outweighed any danger of unfair prejudice. The court noted that relative to propensity, the officer's testimony was not similar to the charged conduct.

Relative to the testimony of the victim's maternal grandmother and grandfather, the trial court found that the testimony clearly and convincingly proved the July 10 and 11 events to which they testified and was relevant to tell a complete story of the crime, to show the Defendant attempted to suppress evidence, and to bolster the victim's claim that she feared the Defendant. The court, likewise, found that the probative value outweighed the danger of unfair prejudice.

Relative to the testimony of Ms. Barcus and Ms. Lancaster, the trial court found that the testimony clearly and convincingly proved the Defendant's conduct before and after the victim's disclosure and was relevant to tell a complete story of the crime, to show the Defendant attempted to suppress evidence, and to bolster the victim's claim that she feared

the Defendant. The court also found that the testimony was relevant to providing contextual background and to explaining the relationship of the parties. The court, likewise, found that the probative value outweighed the danger of unfair prejudice. The court, though, excluded testimony regarding any alleged abuse the Defendant might have committed against Ms. Barcus.

Relative to Ms. Barendse's testimony, the trial court found that her testimony clearly and convincingly proved the events on July 11, 2011, occurred and was relevant to complete the story of the crime and to bolster the other testimony regarding the Defendant's harassing and threatening the victim's mother and her family. The court, likewise, found that the probative value outweighed the danger of unfair prejudice.

Relative to the victim's mother's testimony, the trial court found that the testimony clearly and convincingly proved the Defendant's conduct before and after the victim's disclosure. Regarding the house fire, the court found that the victim's mother discovered the fire not long after the Defendant's arrest and that the Defendant crashed the minivan into the victim's grandparents' house on the same day. The court found that the victim's mother and the Defendant were the only people who had access to the house at the time of the fire. The court acknowledged that the evidence was circumstantial and that the Defendant had not been charged with a crime. However, the court found that the evidence clearly and convincingly showed the Defendant had started the fire. The court found that the victim's mother's testimony, including her testimony regarding the fire, was relevant to tell the complete story of the crime, to show that the Defendant attempted to suppress evidence, and to bolster the victim's claim that she feared the Defendant. The court, likewise, found that the probative value outweighed the danger of unfair prejudice.

Relative to the victim's testimony, the trial court found that the testimony clearly and convincingly proved the Defendant's conduct before she disclosed the alleged abuse to the police and was relevant to telling the complete story of the crime, to explaining why she did not disclose the allegations earlier, to providing a contextual background, and to explaining the relationship of the parties. The court, likewise, found that the probative value outweighed the danger of unfair prejudice. However, the court prohibited the victim from testifying relative to any sexual abuse that might have occurred in Wilson County at the Mount Juliet home.

The trial court noted that its findings and conclusions contemplated that the victim would first testify at the trial about her fear of coming forward with the allegations before the relevant evidence would be offered. The court reasoned that if the victim testified she were afraid, her fear and credibility would become critical issues at the trial. The court stated that it would instruct the jury about the proper consideration of the evidence.

The record reflects relative to the testimony of Officer Boone, Ms. Barendse, Ms. Barcus, Ms. Lancaster, the victim's maternal grandparents, the victim's mother, and the victim that the trial court complied with the procedural requirements of Tennessee Rule of Evidence 404(b) in reviewing the relevant testimony. Before the trial began, the court held a two-day evidentiary hearing to determine the admissibility of the Defendant's conduct on July 10 and 11 and his controlling conduct during his marriage to the victim's mother. Relative to each witness, the court determined that the material issue presented was the victim's credibility in explaining why she delayed reporting the sexual abuse and that the relevant testimony completed the story in order for the jury to understand why the victim did not report the sexual abuse earlier. *See State v. Kenneth Duane Hall*, No. E2014-02078-CCA-R3-CD, 2015 WL 3955500, at *6 (Tenn. Crim. App. June 30, 2015); *see also Shockley v. State*, 585 S.W.2d 645, 649 (Tenn. Crim. App. 1978); *Marable v. State*, 313 S.W.2d 451, 459 (Tenn. 1958) (stating that "[t]he actions and behavior of accused when charged with the crime . . . are . . . relevant" (internal quotation marks and citation omitted)); Neil P. Cohen et al., *Tennessee Law of Evidence* § 4.04[13] (6th ed. 2011). The court found that the witness testimony clearly and convincingly showed that the Defendant threatened and harassed anyone he thought might testify against him. *See State v. Maddox*, 957 S.W.2d 547, 552 (Tenn. Crim. App. 1997) (stating "[a]ny attempt by an accused to conceal . . . evidence, including an attempt to suppress the testimony of a witness, is relevant as a circumstance from which guilt of the accused may be inferred" (internal quotation marks and citation omitted)). The court also found that the victim's credibility was critical to the case because she delayed reporting the sexual abuse. The victim testified that she was afraid of the Defendant and that her fear prevented her from disclosing the abuse earlier. The testimony about the Defendant's conduct on July 10 and 11 completed the story and supported the victim's claim that she was afraid of the Defendant and that her fear prevented her from disclosing the abuse earlier. Likewise, the court found that the probative value of the relevant witness testimony was high and outweighed any danger of unfair prejudice. We note that the court properly found that the alleged conduct was not sexual in nature and dissimilar to the charged conduct in the indictment, which did not show a propensity for sexual misconduct. We conclude that the court did not abuse its discretion by permitting the witnesses to testify about the Defendant's conduct on July 10 and 11 and his controlling behavior before the victim's disclosure.

Relative to the testimony of Officer Fresen and Detective Bridges, the Defendant argues that the witnesses provided expert testimony related to the fire investigation, although they were not qualified as experts. The record reflects that the witnesses did not testify at the pretrial evidentiary hearing. The record, likewise, reflects that the Defendant did not object to the witnesses' testifying or to the substance of the testimony and that the Defendant did not object on the ground that the witnesses were providing improper expert testimony. We note

that the Defendant also did not request a jury-out hearing to determine the admissibility of the testimony.

In any event, the trial court found that based on the victim's mother's testimony, she discovered the fire not long after the Defendant's arrest and that the Defendant crashed the minivan into the victim's grandparents' house on the same day. The court found that the victim's mother and the Defendant were the only people who had access to the house at the time of the fire and noted that the insurance investigator concluded the Defendant started the fire. The court stated that although the evidence was circumstantial and the Defendant had not been charged with a crime, the evidence clearly and convincingly showed the Defendant started the fire. The court found that evidence of the fire was relevant to tell the complete story of the crime, to show that the Defendant attempted to suppress evidence, and to bolster the victim's claim that she feared the Defendant.

Relative to the trial court's limiting instructions to the jury about the proper use of the relevant testimony, the record reflects that although the court stated in its written order that it would provide an instruction when each witness testified and during its final charge to the jury, the court only gave limiting instructions during the testimony of Ms. Barendse and Ms. Barcus. At the conclusion of Ms. Barendse's testimony, the court told the jury as follows:

> You just heard testimony from Ms. Barendse related to other acts that were allegedly committed by the defendant, going to the hospital, that are really not included in this trial.

> If you find that the defendant did these other acts, . . . you may not consider that as evidence of the defendant's character or of his propensity to commit the crimes at issue in this trial, rather you may consider it as it relates to the complete story of the charges that are included in the case[.]

> It . . . is not as to his propensity to commit the crimes that he is on trial for, but just a complete story of what was all going on. All right.

During Ms. Barcus's testimony, the court interrupted and instructed the jury as follows:

> Members of the jury, again, I want to mention to you something that I think I should mention at this point. You are hearing testimony now and the testimony has to [do] with other acts from Mrs. Barcus . . . related to some other acts that really are not included in this trial. They are in the trial naturally, but it has to [do] with other acts that are not, that you could consider but must not consider as evidence of the defendant's character or of his

-44-

propensity to commit the crimes at issue in this trial. These [matters] are being brought to your attention to just complete the story of the charges . . . but not as evidence of whatever he is charged with in this case.

If you follow that, I will give you a long instruction at the end of the trial, but this . . . is something that is coming in here not as a specific charge that he is here about, but as to matters related to the whole situation and to complete the story involved in this situation.

The trial court properly instructed the jury relative to the testimony of Ms. Barendse and Ms. Barcus. Regarding the remaining witnesses for whom a limiting instruction was not provided at the time of the testimony, the record reflects that trial counsel did not request the court to instruct the jury similarly when each witness testified. *See* T.R.A.P. 36(a) (stating that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"); *see also* Tenn. R. Evid. 105 ("When evidence which is admissible . . . for one purpose but not admissible . . . for another purpose is admitted, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly."); *State v. Gibson*, 973 S.W.2d 231, 243-44 (Tenn. Crim. App. 1997) (stating that the burden to request a limiting instruction is on the party seeking the instruction).

In any event, after all the evidence was presented and before the jury began deliberations, the trial court instructed, in relevant part, as follows:

You have heard testimony regarding other crimes, wrongs or acts allegedly committed by the defendant. You are reminded that the defendant is not on trial for these alleged acts or incidents. If from the proof you find that the defendant has committed acts or crimes other than those for which he is on trial you may consider such evidence for the limited purpose of determining whether it provides the complete story of the crime, that is, such evidence may be considered by you for the other crime or act and the alleged crimes on trial are locally related or connected, so that the proof of the other tends to [be] necessary to prove those charges or is necessary for a complete account thereof.

You may not consider such evidence to prove his disposition or propensity to commit such crimes as those at issue in this trial, such evidence of other crimes, wrongs or acts if considered by you for any purpose must not

be considered for any purpose other than those specifically stated above in . . .
these instructions.

We conclude that the court's limiting instruction regarding the permissible use of the testimony was sufficient. The court instructed the jury properly, and the jury is presumed to have followed the court's instructions. *See State v. Kiser*, 284 S.W.3d 227, 272 (Tenn. 2009); *State v. Woods*, 806 S.W.2d 205, 211 (Tenn. Crim. App. 1990).

We conclude that the trial court did not abuse its discretion by permitting the State to present the relevant evidence and that the court provided the jury with proper limiting instructions regarding the permissible purposes of the evidence before the jury began deliberations. The Defendant is not entitled to relief.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE